**TIRE JOCKEY SERVICE, INC., Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2003.

Decided Oct. 31, 2003.

Reargument En Banc Denied Dec. 29, 2003.

Douglas Maloney, Langhorne, for petitioner.

William H. Blasberg, Conshohocken, for respondent.

BEFORE: FRIEDMAN, Judge, and LEAVITT, Judge, and MIRARCHI, JR., Senior Judge.

OPINION BY Judge FRIEDMAN.

Tire Jockey Service, Inc. (Tire Jockey) petitions for review of the December 23, 2002, order of the Environmental Hearing Board (EHB), which dismissed Tire Jockey's appeals from: (1) an order and civil penalty assessment which the Department of Environmental Protection (DEP) issued to Tire Jockey for operating a residual waste processing facility without a permit; and (2) DEP's denial of an application for a general permit. We vacate and remand.

Tire Jockey is a New Jersey corporation and the operator of a waste tire processing/recycling facility located at USX Industrial Park in Fairless Hills, Bucks County, Pennsylvania (Fairless Hills Facility). Alfred J. Pignataro, Jr. is the president and majority shareholder of Tire Jockey and is responsible for the company's operations.[1] (Findings of Fact, No. 2.)

Tire Jockey began operations at the Fairless Hills Facility in June of 2000. Tire Jockey's fully-implemented operation was to consist of three parts: (1) the sale of serviceable tires, i.e., tires which can be re-used as tires; (2) the sale of cut component pieces of non-serviceable tires, i.e., tires which can no longer be used as tires; and (3) the manufacturing of rubber mats and crumb rubber (Percofill), which is used as a playground safety covering. The serviceable tires would be identified, categorized by size, branded, stored as inventory and made available for sale. The non-serviceable tires would be cut into five component pieces: the tread section; two sidewalls; and two intact metal beads. The tread sections and metal beads would be sold for the manufacture of recycled rubber products, for tire-derived fuel or for scrap. The steel-free sidewall sections would be retained and used by Tire Jockey as raw material for the manufacture of Percofill or rubber mats. (Findings of Fact, Nos. 16–17, 24 n. 1.)

---

1. In 1998, Pignataro received a process patent for used tire recycling. The patent describes a method for sorting waste tires into those which can still be used and those which cannot still be used as automobile tires. The patent then describes a method for manufacturing recycled rubber products from the unusable tires. (Findings of Fact, Nos. 3–4.)

On August 1, 2000, DEP inspected the Fairless Hills Facility. The inspector observed employees operating a machine that cut whole used tires into five component pieces. He observed the operation of another machine that slit the tread sections transversely so that they could be stacked on pallets. DEP informed Pignataro that it considered the operations to be residual waste processing which required a residual waste processing facility permit. DEP also advised Pignataro to cease operations until Tire Jockey had obtained a permit for such a facility. On August 16, 2000, DEP issued a Notice of Violation (NOV) to Tire Jockey for processing waste tires without a residual waste processing facility permit. (Findings of Fact, Nos. 23, 25–26.)

At a meeting held on September 20, 2000, DEP provided Pignataro with a general permit application and informed him that it would be appropriate to submit such an application for Tire Jockey's operations.[2] On December 12, 2000, Tire Jockey filed the application; however, DEP denied the application by letter dated June 8, 2001. (Findings of Fact, Nos. 28, 49, 66.)

DEP performed additional inspections on September 25, 2000, and October 26, 2000. On both occasions, the inspector observed numerous pallets of stacked tire pieces and substantial quantities of whole tires. On October 26, 2000, the DEP inspector observed Tire Jockey employees receiving and sorting whole used tires. On October 27, 2000, DEP issued a second NOV to Tire Jockey for receiving, sorting and storing waste tires at the site without

a transfer facility permit. (Findings of Fact, Nos. 29, 31–32.)

DEP returned to inspect the site on November 2, 2000, and December 20, 2000. In December, DEP counted approximately 30,000 whole tires inside the building and approximately 20,000 tires, either whole or cut, outside the building. On January 22, 2001, DEP issued an Order and Civil Penalty Assessment, citing Tire Jockey with operating a residual waste processing facility without a permit. The Order directed Tire Jockey to immediately cease accepting and processing waste tires without a permit, remove all waste tires within thirty days and submit all records related to the disposal of waste tires from the site within forty-five days. DEP also assessed a civil penalty of $54,000 for the violations. (Findings of Fact, Nos. 33–34, 38, 40.)

Tire Jockey appealed the Order and Civil Penalty Assessment and the denial of the general permit application to the EHB. On December 23, 2002, after hearings on the matter, the EHB made findings of fact and conclusions of law and dismissed the appeals. Tire Jockey now petitions this court for review of the EHB's decision.[3]

Tire Jockey argues that the EHB erred in concluding that Tire Jockey needs a permit to operate the Fairless Hills Facility. Tire Jockey contends that the tires at the Fairless Hills Facility are not "waste" as that term is defined in Article IX of the residual waste regulations.

The regulation at 25 Pa.Code § 287.2(c)(3) states that waste tires are regulated as residual waste under Article

---

2. A "general permit" is a permit issued by DEP for a specified category of beneficial use or processing of solid waste. 25 Pa.Code § 287.1.

3. Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

IX of the residual waste regulations regardless of whether they fall within the definition of municipal waste or residual waste.[4] 25 Pa.Code § 287.2(c)(3). The definition in Article IX states that "waste" is:

(i) Discarded material which is recycled or abandoned. A waste is abandoned by being disposed of, burned or incinerated or accumulated, stored or processed before or in lieu of being abandoned by being disposed of, burned or incinerated....

(ii) Materials that are *not* waste when recycled include materials when they can be shown to be recycled by being:

(A) Used or reused as ingredients in an industrial process to make a product *or* employed in a particular function or application as an effective substitute for a commercial product, provided the materials are not being reclaimed.... *Sizing, shaping or sorting of the material will not be considered processing for the purpose of this subclause of the definition.*

. . . .

(v) In enforcement actions implementing the act, *a person who claims that the material is not a waste in accordance with subparagraph (ii) shall demonstrate that there is a known market or disposition for the material, and that the terms of the exclusion have been met.* In doing so, appropriate documentation shall be provided (such as contracts showing that a *second person* uses

the material as an ingredient in a production process) to demonstrate that the material is not a waste. In addition, owners or operators of facilities claiming that they actually are recycling materials shall show that they have the necessary equipment to do so.

25 Pa.Code § 287.1 (emphasis added). A material is "recycled" if it is "used, reused or reclaimed." *Id.* A material is "reclaimed" if it is "processed to recover a useable product, or if it is regenerated." *Id.* A "product" is a "commodity that is the sole or primary intended result of a manufacturing or production process." *Id.*

■ The question before us is whether the tires at Tire Jockey's Fairless Hills Facility fall within the terms of the exclusion in subparagraph (ii) of the definition of "waste" in Article IX. The position of DEP is that, under the plain language of subparagraph (ii), "it is only when materials *are* recycled in one of the ways described that they are not waste." (DEP's brief at 7) (emphasis added). In other words, DEP believes that the tires at the Fairless Hills Facility are "waste" until they actually *are* put to beneficial use.[5] Tire Jockey's contrary position is that, pursuant to the plain language of subparagraph (ii), a material is no longer waste "if it can be shown that it *will be* recycled by being used or reused."[6] (Tire Jockey's brief at 18) (emphasis added). The EHB designated these conflicting positions the "timing issue," i.e., when, in the process of recycling, is waste no longer waste. (EHB's op. at 2, 31.) We begin to answer

4. The definition of municipal waste states that it is waste resulting from the operation of commercial establishments. 25 Pa.Code § 287.1. Here, the parties have stipulated that Tire Jockey picks up tires from automobile and retail tire dealers. (S.R.R. at b2; Stipulation of Facts, ¶ 2.) Thus, the tires here are municipal waste, but they are regulated as residual waste.

5. The implication is that DEP should have oversight of a tire's entire journey from discarded "waste" to beneficial use.

6. Thus, Tire Jockey believes that DEP's oversight of waste tires ends once there is proof that the waste tires will be used or reused.

this question by examining the plain language of subparagraph (ii).

Subparagraph (ii) of the definition states that materials are *not* waste when they are being used or reused as ingredients in an industrial process to make a product *or* employed in a particular function or application as an effective substitute for a commercial product, *provided the materials are not being reclaimed.* By definition, reclaiming involves "processing" which, in this subclause does *not* include "sizing, shaping and sorting." This means that, when materials are "sized, shaped and sorted" in connection with their use or reuse as an ingredient in an industrial process or as an effective substitute for a commercial product, the materials are not being "processed" or "reclaimed" and, therefore, are *not* "waste."

DEP agrees with this interpretation of subparagraph (ii), stating in its brief that if Company X had to size, shape or sort materials *before* using them as an ingredient in an industrial process, that would *not* be "processing" or "reclaiming," and, thus, the materials would not be "waste." (DEP's brief at 12.) In another example, DEP states that, where a company brings cadmium batteries to its facility, grinds them up and *then* reuses the extracted material in a manufacturing process, the batteries are *not* "waste." [7] (DEP's brief at 15.) Under subparagraph (ii), then, materials are *not* "waste" if they are merely sized, shaped or sorted *before* being used.

Here, Tire Jockey does not "process" or "reclaim" its tires before the tires are used or reused. Tire Jockey merely sorts and shapes the tires, separating the serviceable from the non-serviceable tires and cutting the non-serviceable tires into pieces. Nevertheless, DEP maintains that the tires are still "waste" because Tire Jockey does not size, shape and sort the tires for its *own* use at the Fairless Hills Facility. We fail to see the relevance of the fact that Tire Jockey does not actually use or reuse the tires at its own site.

Subparagraph (v) states that one can demonstrate that a material is not "waste" under subparagraph (ii) by providing a *contract* showing that a *second person* uses the material as an ingredient in a production process. Subparagraph (v) also requires that those claiming that they actually are recycling materials on their own sites show that they have the necessary equipment to do so. The clear implication is that some entities may *not* claim that they are actually recycling materials on their own sites. Thus, to qualify for the subparagraph (ii) exclusion, it is *not* necessary that an entity use or reuse the materials for its own purposes at its own site.

Based on the foregoing, we conclude that, under subparagraph (ii), waste tires are no longer "waste" once it can be shown that the tires *will be* recycled by being used or reused as an ingredient in an industrial process to make a product or by being employed in a particular function or application as an effective substitute for a commercial product. This is the case despite the fact that another entity sizes, shapes and sorts the materials beforehand at another location. The EHB erred in concluding otherwise.

■ The next question is whether Tire Jockey demonstrated that the tires at the Fairless Hills Facility will be recycled in the manner described. Having erroneously concluded that subparagraph (ii) applies only to materials that *are* being recycled, the EHB did not make findings of fact and conclusions of law addressing this ques-

---

**7.** We note that DEP's illustrations seem contrary to DEP's position that, under subparagraph (ii), materials are "waste" until they are actually put to use.

tion. Tire Jockey presented documentary and other evidence which, Tire Jockey believes, demonstrates that there is a known market for its tires and that its tires will be used or reused as ingredients in an industrial process or as an effective substitute for a commercial product. The EHB did not consider such evidence.[8] As the fact-finder, the EHB makes all determinations of credibility and evidentiary weight. *T.R.A.S.H., Ltd. v. Department of Environmental Resources*, 132 Pa.Cmwlth. 652, 574 A.2d 721, *appeal denied*, 527 Pa. 659, 593 A.2d 429 (1990).

Accordingly, we vacate and remand to the EHB for findings of fact and conclusions of law relating to whether Tire Jockey demonstrated that its tires are not "waste" under subparagraph (ii) because there is a known market or disposition for its tires at the Fairless Hills Facility and because the tires will be used or reused as ingredients in an industrial process or as an effective substitute for a commercial product.[9]

### ORDER

AND NOW, this 31st day of October, 2003, the order of the Environmental Hearing Board (EHB), dated December 23, 2002, is hereby vacated, and this case is remanded to the EHB for findings of fact and conclusions of law relating to whether Tire Jockey Service, Inc. demonstrated that there is a known market or disposition for the tires at the Fairless Hills Facility and that the tires will be used or reused as ingredients in an industrial pro-

cess or as an effective substitute for a commercial product.

Jurisdiction relinquished.

---

8. We note that DEP stipulated that a worker was making mats at the Fairless Hills Facility during an inspection on December 4, 2001. (Stipulation No. 52(s), S.R.R. at 14b.) Indeed, Tire Jockey's manufacturing and sale of rubber mats is well-attested by the evidence in the record. (*See, e.g.*, O.R., Exhibits P10–P12.) Moreover, the record contains evidence relating to Tire Jockey's sale of serviceable tires and the market for crumb rubber, tire-derived fuel and tire chips. (*See, e.g.*, O.R., Exhibits P13–P14, P33, P40.)

9. Because of our disposition of this issue, we decline to address Tire Jockey's alternative argument.